MARTHA A. STEWART, as Administratrix, etc., Respondent, *v.* NEW YORK, ONTARIO and WESTERN RAILROAD COMPANY, Appellant.

*Supreme Court, Third Department, General Term, December* 11, 1889.

1. *Master and servant. Duty.*—An operative has a right to expect that his master will entrust the handling of dangerous materials only to experienced and careful workmen, and that the methods employed shall be such only as are reasonably safe.
2. *Same.*—The thawing of dynamite, when necessary, should be done by prudent men, acquainted with the possible danger, and by such means as shall cause, within reasonable limits, the least possible risk.
3. *Same.*—The evidence, in this case, was held sufficient to send the case to the jury on the question of negligence.

Appeal from judgment in favor of plaintiff entered upon verdict of a jury.

The defendant was endeavoring to remove an ice jam in a river. It employed dynamite cartridges to break the ice and a number of laborers to remove the broken ice, among whom was the plaintiff's intestate. The intestate had nothing to do with the blasting or with the dynamite.

The dynamite cartridges were about one inch in diameter and eight inches long, covered with paper coated with paraffine. They freeze at about forty-two degrees Fahrenheit and when frozen do not explode. These cartridges were exploded by attaching a cap and a fuse.

Dynamite is a name for compounds of nitro-glycerine and some inert absorbent substance. Nitro-glycerine itself explodes at from 350 degrees to 360 degrees.

The cartridges which were to be used by defendant were

frozen, and it was necessary that they should be thawed. On Friday and Saturday, March 23 and 24, one Flynn had been thawing out the dynamite and Brehany had worked under him. They built a fire, set up a crotched stick and a pole from the stick to the bank. They put a pail on the stick half full of water and put the cartridges in. They thus thawed about seventy-five pounds.

The next day Crandall took charge. They built a fire on the opposite side of the river upon the ice, took a zinc pail holding about fourteen quarts, rested a stick on two pieces of ice and thus hung the pail over the fire. They filled the pail half full of water so that the cartridges would not be wholly under water. They stood the cartridges up in the water and turned them when the lower end had been thawed.

The cartridges rested on the bottom and against the sides of the pail. Crandall himself had put in the three cartridges first placed in the pail and had taken them away to use. Then Brehany put in three or four more in the same water. He then turned them upside down to thaw the other end. They exploded, and the intestate, who was not far distant, was killed.

The immediate cause of the explosion is not clear. Brehany says he did not drop the cartridges. Other witnesses say that dropping such a cartridge will not explode it.

One theory is that the hot water softened and loosened the paper which enclosed the dynamite and that the heat caused a disintegration by which the nitro-glycerine was separated from the inert absorbent with which it had been mixed. That when thus separated it flowed out upon the bottom of the pail, and that the heat there was sufficient to explode it. There is evidence that the fire, made of drift wood and carpenters' chips, had grown hot. One witness says he felt it at a distance of fifteen feet.

Evidence was given that an apparatus for thawing dynamite had been constructed which consisted of an inner and outer pail, the space between being filled with water.

There is evidence that a common way to thaw dynamite is to put it in a pail of hot water. Some witnesses had even seen the pail hung over a fire. But it is testified that it needs care and judgment to prevent the fire or the water from getting too hot, as the water should not be allowed to boil.

*George H. Carpenter*, for appellant.

*T. F. Bush*, for respondent.

·LEARNED, P. J.—We do not see anything in this case which shows contributory negligence on the part of the intestate. It was a cold day, and it was not unreasonable that he should approach a fire. Whether or not he knew that at that moment there were cartridges in the pail, we cannot tell. He had been directed with others to get a pole for a pike pole. He and they got them from the drift. There was no work to do until the blasting had been done. Stewart, the deceased, seems to have been waiting for an opportunity to work, or, perhaps, as another witness had done, he was trimming his pole. That, under such circumstances, he should go within some five feet of a fire where a man was working is no such conclusive evidence of negligence that we can disregard the finding of the jury on that point.

The important question is on the negligence of. the defendant.

This cannot be determined upon the rule that the master must furnish a safe place to work. For Stewart was not set at work on the fire. His work was to be the pushing of the broken ice after a blast. And it would be a forced application of the rule to say that a place was unsafe because an unforeseen explosion happened near it of cartridges temporarily brought there. Hussey *v.* Coger, 112 N. Y. 614.

The learned justice who tried the case held that this work of thawing out the cartridges was the work of the master; that if the master was not exercising the care commensurate with the evidence of danger, it was liable. And he submitted

to the jury the question whether, upon the whole evidence, the means used were reasonably safe.  He charged that the master was bound to use ordinary care, not the highest, but a care commensurate with the danger which might reasonably be apprehended.

It is proved that the cartridges did not explode from being dropped.  Some cause must have existed, and there was no cause but the fire.  In what way this happened cannot be told: whether from the escape of nitro-glycerine from the cartridges, or from some sudden blazing up of the flame over the edge of the pail, or in some other way.

Now, while the testimony shows that dynamite is often thawed in pails of hot water, yet it is evident that generally this is not done over a flaming fire.  Even the witness who speaks most confidently on this subject, and who testifies that he has often done this very thing, says that there should be an arrangement to move the pail from one point to another and graduate the heat, and further says that the water should not boil.  It is quite apparent that a fire of such materials as were used in this case, out of doors, might heat the part of the pail above the water, or might even touch the part of the cartridges above the water.  As the cartridges rose above the water and rested against the side of the pail, they were possibly ignited from the heat of the pail or from flame.

The case is not quite analagous with that where some implement or contrivance is used, and precisely similar implements or contrivances have previously been used many times with safety.  When witnesses show that cartridges have, in former instances, been thawed in pails over fires, it by no means follows that such fires were similar to that used on this occasion.  It might be safe to put an explosive cartridge in a pail of water over a moderate fire of coals, while it might be very unsafe to do this over a fire which would produce a flame, and that, too, out of doors, where the flame might be blown by the wind.  In other words, one fire may differ so much from another fire that we cannot say that it is

a similar implement or contrivance and that it was not negligent to use this fire to thaw cartridges in a pail because in others instances other fires have been safely used for this purpose. We do not mean, however, that the ordinary method of doing this work may not be taken into consideration on the question of negligence.

In stating the duty of the master the learned justice said it was his duty to furnish competent employees and reasonably safe appliances. This is substantially the rule stated in Pantzar *v.* Tilly Foster I. M. Co., 99 N. Y. 368, at 372, viz.: "adequate and suitable tools and implements; skillful and competent workmen to direct his labor and assist in the performance of his duties." This rule is not changed by Stringham *v.* Hilton, 111 N. Y. 198.

The man who had charge of the business the day of the accident was Crandall, a stone mason. He had never heard that cartridges exploded with heat, and never had any instructions about handling dynamite. He had thawed dynamite by putting cartridges into heated water. He once saw a man put cartridges in the water in a pail and put the pail on the back part of a cook stove in which was a light fire.

Brehany, who alone was at the fire when the accident happened, knew nothing about dynamite until Flynn instructed him a day or two before. Flynn did not tell him to put the cartridges in carefully; but told him not to drop them in the fire.

Flynn says that from his experience the cartridges would not explode from heat; but he adds that he understood it would take from 300 degrees to 500 degrees Fahrenheit to explode dynamite. A range of 200 degrees on such a point does not indicate accurate knowledge.

Dicks, who directed Flynn to thaw the cartridges, told him to be careful, but gave him no instructions how to do it. Yet he says it required a great deal of judgment to tend the fire, with water and cartridges in it. Yet he did not learn whether there was danger in its getting too hot.

We think then that there was evidence from which the jury might find that through the ignorance and want of skill of these workmen there was not that reasonable care taken in thawing these cartridges which the master owed to those engaged in its service. A powerful explosive such as dynamite should be handled with care proportionate to the injury which it may occasion. If it was necessary to thaw it, this work should be done by prudent men acquainted with the possible danger, and by such means as should cause, within reasonable limits, the least possible risk.

The defendant argues that no special skill is required to handle dynamite. Perhaps not, but care and judgment were needed, such as might be gained by experience and knowledge of what might cause an explosion.

The question to a witness whether he had thawed " rend-rock," was not improper. " Rend-rock" is a kind of dynamite.

Devine was a practical chemist who had made a study of explosives. We have examined the questions put to him to which the defendant objected. We think they came within the line of admissible expert testimony.

The court was asked by defendant to charge that the question before the jury was not one of science, and he so charged ; but being in doubt as to the meaning of the counsel he gave an opportunity for explanation. There was no error in this.

We think that there was no error in the charge ; which of course must be taken as a whole.

It has been justly said that the line of division between the duty of the master and that of the operative in such cases as this is difficult to define by any general description. Webber *v.* Piper, 109 N. Y. 496. But it seems to us that an operative has a right to expect that the master will entrust the handling of dangerous materials only to experienced and careful workmen and that the methods employed shall be such as are reasonbly safe.

Judgment and order affirmed, with costs.

PUTNAM, J., concurs.

FISH, J. (dissenting).—The plaintiff's intestate, and the men who handled the dynamite, were all engaged as co-laborers, and were all co-employees of defendant in one job of work. There was an ice jam in the river which disturbed the convenience of defendants. The work to be done was the removal of that gorge of ice, so that the river would clear itself and thus relieve defendants' road-bed. The means to be used consisted of axes, pike-poles and dynamite. The undertaking was a hazardous one to the persons employed. There was no safe place about it. Every means used and every place in the surroundings was dangerous to the lives and limbs of the persons engaged. Each of the persons who accepted employment on the job knew and could plainly see all this; and each man was bound to maintain careful discipline according to the nature of the work and the means to be used, and to avoid all unnecessary exposure, if he cared for his own safety. It does not appear that any unskilled or incompetent persons were employed, or indeed, that there was any occasion for men of particular skill, either in handling of the dynamite or in any other part of the work. If the plaintiff is entitled to recover, it must be on the ground that the men who handled the dynamite were careless and negligent. Then it is clearly a case of negligence of a co-servant employed in the same common undertaking and business. In such case the employer is not liable. There is no case reported where a recovery against an employer has been sustained for an injury to an employee occasioned by the negligence or carelessness of a fellow-workman engaged in the same particular job of work. The contrary has repeatedly been held and seems to be a well-settled rule. Crispin *v.* Babbitt, 81 N. Y. 516; McCosker *v.* Long Island R. R. Co., 84 Id. 77; Besel *v.* N. Y. C & H. R. R. R. Co., 70 Id. 171; Beilfus *v.* N. Y., L. E. & W. R. R. Co., 29 Hun, 556; Deforest

*v.* Jewett, 88 N. Y. 264 ; Kenny *v.* Shaw, 133 Mass. 501, and many other authorities.

The correct, well-defined rule applicable to cases of this kind, is expressed in the opinion of the court in Laning *v.* N. Y. C. R. R. Co., 49 N. Y. 521, as follows : " A master is not liable to those in his employment for injuries resulting from the negligence, carelessness or misconduct of a fellow-servant engaged in the same general business ; nor is the liability of the master enlarged when the servant who has sustained the injury is of a grade of service inferior to that of the servant or agent whose negligence, carelessness or misconduct caused the injury, if the services of each in his particular labor are directed to the same general end. And though the inferior in grade is subject to the control and directions of the superior whose act or omissions had caused the injury, the rule is the same."

" Nor is it necessary, to exempt the master from a liability, that the sufferer and the one who caused the injury should be at the time engaged in the same particular work ; if they are in the employment of the same master, engaged in the same common work and performing duties and services for the same general purposes, the master is not liable."

In this case, every man employed by defendant on the work was a co-employee of every other person so employed. If one of the employees handling pike-poles had been careless and injured another, the employer would not be liable, even if the person injured was the man who handled the dynamite. Not more so is the employer liable, because the negligence came from the man who had charge of the dynamite. When a person engages in a dangerous business, he takes the risk of it. Every means used and every place in the surroundings was dangerous to the lives of the persons engaged. The rule that the employer must find a safe place for his workmen does not apply in such cases. Some kinds of business are never safe, and there is no safe place connected with them. Any undertaking which involves the use of the dan-

gerous elements and contrivances now in use is full of peril to the workman. The only safety from harm in the use of those deadly forces of electricity and dynamite, even under the most skilled management and the greatest possible care, is a goodly distance away from the seat of the operations.

It is, however, said that the employment of the plaintiff's intestate had no connection with the use of the dynamite; that his duties were on the river with the pike-poles; and the means used to loosen the ice by the explosive force was a separate business.

Suppose, for the sake of the argument, we concede this to be so, then the defendant owed the employees engaged on the river no duty, so long as the disaster did not come from the careless use near the men while on the river.

Stewart had no invitation to go to the spot where the dynamite was prepared for use. The defendant's agents were doing that work about 150 feet away from the work on the river, where Stewart's work called him. If he had left the place of his duty and went without invitation to the place where the dangerous explosive was, he put himself in the way of it and thus brought the misfortune upon himself.

Finally. Whether there was negligence upon the part of the workmen who were engaged in thawing the cartridges may have been properly disposed of by the jury; and yet it is difficult to see how the charge of negligence on the part of defendant's agents is sustained, except upon the principle that any error of judgment or any deviation from absolute perfection in the handling of that class of dangerous goods ought to render the party liable if somebody is hurt by it.

But without deciding this question the judgment should be reversed.

Judgment affirmed, with costs.

NOTE ON "MASTER'S DUTY TO EMPLOY COMPETENT SERVANTS."

It is the master's duty to employ only competent men. Coppins *v.* N. Y. C. & H. R. R. R. Co., 122 N. Y. 557. Competent man, defined.    Id.

As to when the jury cannot infer the company's negligence from the fact of employing a telegraph operator of seventeen years of age.  Sutherland *v.* T. & B. R. R. Co., 125 N. Y. 737.

The master is bound to use reasonable care to provide and employ competent and skillful servants, and to discharge on notice or knowledge, or the means of knowledge, any who fail to continue such.    Tonneson *v.* Ross, 58 Hun, 415.  This rule was applied in the case of an injury to an employe whose captain, who was also in the service of the defendants, caused the accident while he was in a drunken condition.  Id.

An employee may rightfully expect his employer to entrust the handling of dangerous materials to experienced and careful workmen, who shall use methods reasonably safe.  Stewart *v.* N. Y., O. & W. R. R. Co., 54 Hun, 638; see also, Wall *v.* D. L. & W. R. R. Co., 54 Id. 454.

The master owes the duty to his servants of employing skillful and competent workmen, where these are needed to direct their labor, or assist in the performance of their work.  Sweeney *v.* N. Y. Steam Co., 15 Daly, 313. The servants have a right to assume that only such workmen are employed. Id.

To render a master liable for an injury sustained by his servant through the negligence of a fellow-servant, in a common employment, it is not enough to show that the latter had fallen into habits of intoxication, which rendered him incompetent to a proper performance of his duty.  Chapman *v.* Erie R'y Co., 55 N. Y. 579.  To render the master liable, where the servant was of good character and proper qualifications when retained, notice of his subsequent evil habits must be brought home to him.  He has a right to rely on the presumption that the character and qualifications, once possessed, continue until he has notice to the contrary.  Id.

See also, Warner *v.* Erie R'y Co., 39 N. Y. 468; and Laning *v.* N. Y. C. R. R. Co., 49 Id. 521.